EIBEL PROCESS CO. v. REMINGTON–MARTIN CO.

(District Court, N. D. New York. July 13, 1912.)

PATENTS (§ 292*)—SUITS FOR INFRINGEMENT—RIGHT TO INSPECTION OF ALLEGED INFRINGING MACHINES.

Suspicion of infringement is not enough to justify an order requiring the defendant in an infringement suit to permit complainant to inspect machines used in its manufacturing plant and alleged to infringe, and unless in exceptional cases such an order will not be made on affidavits made prior to the taking of testimony in the case.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 446; Dec. Dig. § 292.*]

In Equity. Suit by the Eibel Process Company against the Remington-Martin Company. On motion for inspection of defendant's alleged infringing machines and to compel defendant to furnish samples of its product. Motion denied.

Fish, Richardson, Herrick & Neave, of Boston, Mass., for the motion.

Hugo & Youst, of Watertown, N. Y., opposed.

RAY, District Judge. This is a suit in equity to restrain alleged infringement of United States letters patent No. 845,224, dated February 26, 1907, and the alleged invention relates to Fourdrinier machines and has for its object "to construct and arrange the machine whereby it may be run at a very much higher speed than heretofore and produce a more uniform sheet of paper which is strong, even, and well formed." The validity of this patent has never been adjudicated. The complainant presents ex parte affidavits tending to show that the defendant is using machines in its factory which come within the claims of the patent in suit. The affiants say they have been in defendant's factory and have observed the defendant's machines in operation, their position, etc., and have conversed with persons, probably operatives found there, and that one end, the breast-roll end, is elevated. No testimony has been taken in the case by either party. The Fourdrinier machines are old, and the patent itself states that the wire screen on which the pulp mixture is carried to form the paper after being discharged from its storage and feeding tank "has usually been arranged to move in a horizontal plane, although I am aware that means have been provided for adjusting the breast-roll end of the wire to different elevations, *usually* below the level to provide for running with different grades of stock, as, for instance, with quick stock and slow stock; but so far as I am aware the making-wire has always had to perform the work of drawing along the stock, and as the wire moved much faster than the stock, the stock waved or rippled badly near the breast-roll end of the wire, which gradually diminished until an equilibrium was established and a smooth, even, and glassy surface presented, and not until the waving or rippling ceased did the fibers (contained in the 'stock,' paper making material) lay down uniformly and produce a well-formed sheet of paper. The machine has been run necessarily at a slow rate of speed to give ample time for the water to escape (through the screen) and for the fibers to lay down so as to make a uniform sheet, and in case the time was insufficient the breast-roll end of the wire had been lowered still further until the desired result was accomplished."

It is a self-evident fact, common knowledge, that a fluid mixture like paper stock, ready for the screen, discharged through a wide-mouthed funnel upon a moving screen, will on meeting the obstruction, if the speed of the stock is greater than that of the screen, or there is a considerable fall, form waves, ripples, and currents, and that some time will elapse before the stock will settle down, become still, so that when taken up and carried again on the wire screen

it will form a smooth, even-surfaced paper. If the breast-roll end of the screen is lowest so that a sort of pool is formed at that end in which the stock may settle and become still, the making-wire or screen as it moves must take the stock from such pool and carry it upward—drag it along. The idea or conception of the patent is that time may be saved, this pool and the dragging of the stock done away with by elevating the breast-roll end of the screen on which the paper is made substantially and to a considerable degree and then discharging the stock (in a fluid state, of course) upon the screen, which is moved at a little more rapid rate than the stock moves as it comes in contact with the screen so that the stock will be carried largely by gravity—that is, be running down hill, aided to some extent by the screen propelled in the same direction, which will catch the onflowing stock as it meets the screen and carry it forward a little more rapidly than it was moving before—and that thus there will be no obstructions, and the waves and currents will be done away, and the formation of paper on the screen commence much sooner and much nearer the breast-roll end, and a greater amount of paper of a smooth and better character than before be produced in a given time. Of course, the machine has means for raising and lowering the breast-roll end as it had before, and a motor power of some kind for moving the screen and also a guide roll and suction boxes. There is no claim of improvement in any of these appliances. As matter of course, some mechanical changes were involved.

The defendant concedes that the breast-roll ends of its screens (wires) in its Fourdrinier machines are elevated above the horizontal plane; but it denies the validity of the patent so far as its screens and machines are concerned, and alleges that same were made and purchased and put in operation more than two years prior to the application for this patent, which was filed August 22, 1906, and then elevated and designed to be elevated the same as is now done.

There is nothing new or novel in the paper making wire or screen, or the means for adjusting the breast-roll of said wire to different elevations, or in the means for adjusting the speed of the said wire. The only question is whether or not the defendant has the right to elevate the breast-roll end of its screen to such an extent that the paper stock will flow down it by gravity instead of being dragged, and regulate the speed of the screen to correspond nearly with the speed of the flow of such stock. No new or novel means for making paper are claimed. So far as appears, the old means are employed; but the arrangement of these means while paper making is going on is different, not with relation to each other, but with relation to the "stock" discharged on the screen, and then the speed of the screen with relation to the speed of the flow of the stock is regulated. I am not called upon to form or express any opinion as to the validity of this patent. I am not called upon to express any opinion as to the defense of prior use, etc., the antiquity of the idea expressed in the patent. The defendant has not had opportunity to cross-examine the persons whose affidavits are presented on this motion, and, if

their testimony is taken, it may not cross-examine or controvert anything they testify to. By testimony taken in the case the complainant has not made a prima facie case of infringement. It does not as yet appear that there will be any dispute or controversy as to the elevation of the breast-roll end of defendant's screens, or their length.

The composition used by defendant in making its paper is no concern of the complainant at this stage of the case, and so far as appears, defendant's product is on the market. I think the motion premature. It is a serious thing to direct a manufacturing corporation to allow the attorney and agents and experts of a rival concern to enter its plant and inspect and measure its machinery and the operation thereof and compel it to furnish samples of its stock and product. "Suspicion" of infringement is not enough to justify such an order as is asked for, and I decline to follow Rowell v. William Koehl Co. (D. C.) 194 Fed. 446, 447, where it is indicated that "suspicion of infringement" will justify an order of inspection. A prima facie case made by taking testimony and concealment by defendant of its alleged infringing devices, or of plans, drawings, and documents would justify such inspection. This is the doctrine of Dobson v. Graham (C. C.) 49 Fed. 17, and Diamond Match Co. v. Oshkosh Match Works et al. (C. C.) 63 Fed. 984, 985. In Diamond Match Co. v. Oshkosh, etc., supra, the court said:

"The complainant is not entitled to the aid of the court, upon the suspicion or an allegation of infringement, to pry into the business operations or appliances of the defendants, either to the end of making out a case against them, or for any other object. The defendants are entitled to protection in their rights and property, and will not be required to make premature disclosures of their matters of defense."

And in Dobson v. Graham, supra, the court said:

"Complainant will not be granted an inspection of machinery of defendant, kept in secret, and claimed to embody important secrets, when complainant produces no evidence tending to show that it infringes his patents."

Cases holding that a defendant and the officers of a corporation may be compelled to produce documents and papers by the writ of subpœna duces tecum have no application whatever. The writ is provided for by statute, and a defendant in a civil case and the officers of a defendant corporation may be compelled to obey it the same as other persons. I do not think such an order as is asked for here should be granted on affidavits made prior to the taking of testimony in the case, except possibly in exceptional cases of which this is not one. As at present advised, I see no reason whatever for ordering the production or examination of defendant's stock or product. If a serious question is presented as to the dimensions of the alleged infringing device and its elevation at the breast-roll end and the relative speed at which the wire screen and stock move when the machine is in operation a case may be presented where inspection should be ordered.

The motion is denied, with leave to renew after complainant has made its prima facie case and defendant has disclosed its defense.